Good morning, honors and mayors of the Supreme Court. I am Martin Bledsoe, and I represent the United States of America in this matter before the Court today. As this Court is very well aware, we are here because of the substantial association and following of the U.S. Constitution franchise. Judge Breyer has found that no reasonable juror can conclude, based on the record of the evidence, that the operation of Mr. Gavana had a substantial association with gaps, trade hanging, trade farms, trade thefts, and the other symbols of its operation. The reasons I'd like to enumerate with the Court's permission, the record shows unmistakably exactly the converse in many respects that I would like to cover. Could I just start with an easy one? That's the franchise fee. You contend that the, I believe, $6 million that was paid was a franchise fee, but doesn't the record show that that, in fact, was a payment for product that was immediately paid back by the sales of those products to third parties, and it happened roughly contemporaneously? Well, what the record shows is that the merchandise, the excess inventory, and the rest of it was very substantial evidence, was not worth actually the price of simply having it. Well, it's what people will pay for it, and people did pay for it, right? No, Your Honor. Third parties did not buy that? Well, first of all, what's required is that the fee be paid, and the fee was paid to... Okay, you call it a fee, they call it a purchase price. It's not a purchase price because the goods themselves were not worth, even as I said in the record, and the evidence shows holding it. But counsel, when you sell a product, what something is worth is what a seller is willing to sell it for and a buyer is willing to pay for it. And Gap says, this was our sales price. They paid it. Now, you've chosen to characterize it as a fee because you say that what was purchased wasn't worth anything, and yet, according to the record, if I understand it correctly, contemporaneously, you sold those worthless goods for another six million or even more dollars to third parties. Are you saying that your client deceived third parties into buying these because they were really worthless? Not at all. What the record shows is that third parties worked with Gabbana. In fact, at the outset of the so-called sale to the third parties, there was a 50-50 relationship between the parties. And the record also shows that from that time forward, Gabbana had reduced its margins to help pay towards that six million dollars. The record also shows that Gabbana spent months in the jungle alley trying to help to assist in sales. That was all bound to buy. Is there anything in the record that shows that either that Gabbana's check or whether it was a wire transfer or what? Wire transfer. Wire transfer. Was there anything in writing that indicated this was intended as a payment of a franchise fee at that time contemporaneously? Absolutely. And it said that that's what it was. Well, what you had was two simultaneous transactions. Right. One is not valid without the other. I understand. Is there anything in either of those contracts that says that that payment was intended to be a franchise fee? No, Your Honor. Okay. And there's nothing in the wire transfer itself that referred to a franchise fee? Nor is that ever required. No, I'm not saying it's required. I'm just saying you're characterizing what the record seems to show is a sale of some goods as a franchise fee. I'm trying to get from you what the record contains that will help me understand why the parties intended this at that time to be a franchise fee, as opposed to something that you come up with later to buttress your case. What the record shows is the very first acquaintance between the Bannon and Gap was in connection with their long-running efforts, months, in fact, a couple of years, to sell the excess inventory. Initially, the Bannon assisted with that. It didn't work out. The record shows it needed to get their office books. It needed to move it. It was unable to move it. It was incurring large fees. The record shows that both the Bannon and its partner in the deal that raised the $6 million to send directly to Gap will take this off your hands, will pay your price, but only if you give us the right in these countries to sell frontline goods. So in every respect, in the course of dealings over a period of many months, the fee, the deal, the price, the cost of being in these valuable franchises in these countries was to make the payment for the goods or there'd be no deal. So you're saying that you, Gabana and its partner, had this albatross on its back continuously. It was never paid these monies by a third party. Right. Very little of it was ever paid. So basically, you took $6 million worth of goods, at least what they were sold for, off their hands, and they just sat around in a warehouse somewhere. You weren't able to dispose of them. The record reflects that a small portion of what they've been disposed of, but the investment rate of them continuing to be paid for by… No, but where are they? They're out in the valley. Okay. They're controlled by both groups, Bannon and Gap. They have not been in the pain. Some of them were resold. My client went down to the site to help to reorganize the goods. Let me ask you this. If I understand the logic of Judge Breyer's order, it is that the contract that you have, what was it, the ISP agreement, specifically prohibited Gabana from using Gap trademarks. They could sell Gap products, but they couldn't use Gap trademarks, and for that reason, Gabana is not associated with the Gap trademark as California law requires. If he's wrong about that, how does that keep every distributor from becoming a franchisee? Well, he is wrong about the facts of this case because he did not consider the numerous ways in which the substantial association between Gap's trade name and its trademarks, which were permitted to be used in certain respects. Why wouldn't Safeway be a franchisee of Coca-Cola? Or why wouldn't any company that operates as a distributor become a franchisee under your logic, just because they're selling their products? You can't become a franchisee just because you're selling, but in this circumstance, you would have the International Sales Program, which was a worldwide major initiative by Gap. It was in 13 countries, Your Honor. It was in the United Kingdom, France, China, Japan, Brazil, and South Africa. It was managed by Gap, and the whole purpose of this particular program was to establish these 13 operations in these major countries where Gap had no other presence. Understood, but why doesn't that make Gabana a distributor of Gap products rather than a franchisee? Distributors are often considered by California franchise law to be franchisees. The statutory definition is sell, offer to sell, or distribute. So the key question is whether or not in the distribution, and in this case, Gabana also sold the goods to Gap, whether or not there's substantial association. But they're specifically prohibited by the contract from associating with the trademark. No, it was not. It was specifically prohibited by the contract. It was calling themselves Gap. They couldn't use the logo. It was good, but they did. Weren't they prohibited from using it on their stationery and billing and business cards? They were, but they were not prohibited from... From selling the stuff. Or from working with their customers directly and indicating to their customers that they were associated substantially with Gap. Indeed, that was the only business that Gap was in. And the entire relationship across three or four years was characterized by associations with Gap. So four times a year, Gap brought the retailers and Gabana together to San Francisco and had meetings that lasted several days in which they talked about how to display the Gap trademarks and from the restaurant. There's an invitation that was sent to each Gap retailer that said, We on Gap Stationery, we invite you... We invite you to come to San Francisco and review our Spring 2005 collections. Please contact Gabana to make the arrangements to come here. The business plan that was required from each retailer. This is the UAE business plan. Gap trademarks prominently displayed on the plan. Under Kim versus Servos Next, that's all that's required, but there's so much more substantial association in this case. Not only were the meetings in San Francisco, but Gabana and Gap representatives traveled right to the premises. But that still doesn't answer the question of whether Gabana itself was authorized to use those trademarks. It was. Exhibit C to the contract specifies particular ways in which they're authorized. And in what way was that? And it's trade... Your Honor, I'm sorry. In what way was that? Trade name. It's not just trademarks. It's trade name. It's trade dress. It's any commercial symbol. Gap worked closely with Gabana to replicate in these locations the exact trade dress of Banana Republic stores. The fixture, the gypsum, the finishes, the look of the stores, as well as, again, Gap's trademark being present everywhere. Kim versus Servos Next was a case in which the parties weren't even allowed to use the mark at all in any fashion or form with the end customers, unlike this case here. In that case, the sole contact, remember, with the first tier, our case that the first tier are the retailers, were some early meetings between the franchisor and the retailer. Here, for three years, there's nothing but franchisor contact with these retailers, emphasizing in every way the substantial association of Gabana with Gap. Found adequate alone in Kim versus Servos Next is the invoices. This is that came from the retailer to Gabana to Gap in this case. In that case, there were different parties, obviously. Gap, Inc. is prominently displayed, the mark at the top of the form. Banana Republic, Old Navy, each of the marks is on the forms that were used. All the emails are from Gap in this case. As I say, Exhibit C, which was mandated to be given to each retailer, you must display all authorized goods for sale in the selling area unless given written consent by Gap. Again, the marks used consistently. Here's a classic example, if you will, to whom it may concern. Please be informed that RHS, one of the retailers, are authorized retailers for Gap, Inc.'s brands, namely Gap, Gap Kids, Gap Baby, Banana Republic, and Old Navy under the international sales program we have with Gabana Golf Distribution. They're authorized to operate in the United Arab Emirates. This was provided for every retailer to be used with anyone to whom it may concern. The bar for substantial association under California franchise law is very, very low. Any one of these under the clear decisions by the commissioners would accomplish it. In JROC, remember, 30% of the goods only were provided by JROC itself, 70% by other suppliers, and just the stick-on labels, and here every good had labels on it, was sufficient to meet the test. I will reserve the remaining time. Thank you very much. Thank you very much, Mr. Glick. Good morning. Good morning, Your Honors. May it please the Court, Krista Anderson for the Gap appellees. Could you pull the mic up a little bit? Thank you. Yes. Great. For several reasons, there was no franchise between Gap and Gabana. As an initial matter, the Gap-Gabana contract is not within the ambit of the CFRA as Gabana is a foreign entity and the parties expressed their clear intent that they not be treated as a franchise. Furthermore, even assuming that the CFRA applied here, Gabana failed to present sufficient evidence to establish any of those three elements of franchise. As the trial court held, Gabana failed to present sufficient evidence of substantial association. Here, Gabana has a contract with specific provisions that bars it from taking actions that would create a substantial association. Secondly, Gabana failed to present sufficient evidence of a marketing plan, preferring instead to rely on evidence about activities and marketing by retailers, not by its own business, which is what is required to be established under the statute. And finally, Gabana failed to present sufficient evidence of a franchise fee. Gabana sold the obligation to pay for the $6 million of inventory in a contract where it sold that inventory for $8.5 million to another entity before it even signed. Counsel, as you know, Mr. Glick obviously has a different perspective on this. Is there anything in the record that shows that that $8.5 million for the inventory referred to by Mr. Glick was in fact paid to Gabana? The record reflects that the CEO of Gabana admitted in deposition, speaking as a representative of Gabana, that Gabana received at least $6 million. Do you remember where it is in the record? I would be happy to provide it, Your Honor. And along the same lines, I think the explanation I thought I heard from Gabana was that they may have received support from, I think it was Roots or one of the entities they were dealing with on the retail level, but in the end the goods weren't sold to third parties, and so somebody is still holding the bag, somebody that's in effect a partner of Gabana. I think all of that speaks to an issue which the district court hasn't parsed for us and makes it a little harder for us to do, but if you're going to supply some record references, I think you need to speak to that issue as well. I would be happy to, Your Honor. As for the franchise fee, what's required under the statute is Gabana has to establish that it paid a franchise fee. It is entirely irrelevant to this case whether some third party paid an alleged franchise fee, which we dispute that they did, but that question of whether or not there was a franchise fee paid by a third party does not bear on the question here. Did Gabana pay a $6 million franchise fee? No, I'm not so sure. I mean, if Gabana is in effect in some kind of partnership with somebody that's operating in the retail level, the retailer wants to be involved, they offer support to Gabana. For our purposes, if there's an entity on the other side that's put up money that serves as a franchise fee, I'm not sure that we're in a position to parse which entity is which. There is no evidence in the record supporting the notion that there is a partnership between Roots and Gabana to the effect that a payment by Roots of a fee constitutes a payment by Gabana of a fee. That would both contradict the provisions in the agreement between GOP and Gabana, which sets out very clear restrictions that one can and cannot be done, and, in fact, as the Court's aware from the briefing, Gabana, in fact, breached a number of those provisions involving parties that shouldn't have been involved in the first place. But here the question must turn on whether Gabana made a payment or was out of pocket of a franchise fee, and not only were they not out of pocket because they had sold that inventory for at least on paper a profit and at a minimum for the same price before they even signed the obligation with GAP. And here we have evidence that by making that sale, we know that at a minimum that was a bona fide wholesale price. It was squarely within the exception that requires the Court to conclude it is not a franchise fee under the law. Let me read you, excuse me, Judge Breyer, wrote, and Gabana's argument only supports the conclusion that customers associated Gabana with GAP products. Gabana must establish something more that its customers associated Gabana with GAP trademark. Can you explain that? I mean, GAP products carry all the GAP trademarks. I would be happy to, Your Honor. The statute requires that Gabana establish this element of substantial association. They have to prove that in this case, operation of Gabana's own business under a prescribed marketing plan causes substantial association with GAP's marks or commercial symbols. What does that mean? We looked at the guidelines from the Commissioner, and the Commissioner explains, in order to determine whether or not there is substantial association, it is necessary, not optional, but necessary to examine whether or not in the operation of the licensee's business, the commercial symbols of the licensor were brought to the attention of the licensee's customers to such an extent they actually regarded it as a chain. It has to be such an association between the operation of the licensee's business under the mark that the licensee's customers think it's a chain. And here, mere reference to the obvious fact that a distributor is selling products that are branded by GAP. You have a lot more than that here. I mean, to read from your own brief, the ISP agreements restrict distributors to selling directly to retailers approved by GAP who in turn can only sell GAP products only in multi-brand retail stores, such as Macy's, in specified store-within-store displays. You have many GAP stores within a larger store. So it's not simply a matter of pushing shirts. The whole GAP experience is being conveyed. The problem here, Your Honor, is this is a confusion induced by the briefing submitted by Gabbana. The question is not whether or not retail stores had businesses that within the store, in some corner of the store, some customer of the retailer might think that was part of a GAP chain. That's not the issue here. The question is whether Gabbana's distribution... I beg to differ. I think that is the issue here for two reasons. One, you're dealing with a distributor relationship, and the Kim case makes clear the California franchise law will speak to the wholesale level. But more importantly, too, the only way the retailer gets the rights to do that is by acquiring the rights in the transaction that runs through Gabbana. So when they say, well, how do I set up a store-within-a-store, and how do I get permission to use all this GAP paraphernalia? The answer is they get it through their distributor, Gabbana. Except we know from the law cited in our brief and the opinions of the Commissioner that taking actions such as providing goods that happen to be marked or approving of advertising, those are not things that are going to cause substantial association. When you have a situation here... Stop. How is that not the case? If you're creating a store-within-a-store, how do you not have substantial association? Because the issue here is not whether or not the retailer's business is substantially associated with GAP's marks. The question here is whether Gabbana's business is. And it must be the focus... From the retailer's perspective, what is Gabbana's business? Gabbana distributes GAP products. And, in fact, it's very clear, and the record is clear in the testimony of the witnesses, that Gabbana was strictly prohibited from doing anything to suggest it was a representative in terms of a franchise of GAP or a chain of GAP, an affiliate of GAP. It couldn't use GAP's trademarks on its stationery, on its business cards. There were so many restrictions, and I'd be happy to list for the Court, there are numerous explicit restrictions in this contract. Gabbana agreed. It shall not adopt any trademark, trade name, trade dress, confusingly similar to or which might be considered to carry the risk of association with GAP. Gabbana couldn't use any marks on its business cards, stationery, or in any other way. Counsel, can I... Yes. Following on Judge Clifton's comment, the contract itself, I think, supports your position. But as frequently happens with contracts, sometimes the parties do things that are different than the contract, and the conduct is, in effect, ratified or there's an estoppel based upon what they're doing. Mr. Glick and his client rely a lot on the Kim case, which sort of partakes of that sort of thing. Taking the concept of Kim, how do you address the concept that, you know, if it quacks like a duck, it's a duck, even though the contract says it's a goose? Well, the key issue to recognize here is Kim and the facts presented in Kim are entirely distinct from what we have here. In the Kim decision, the court was presented with facts where the alleged franchisor would go into a building, establish a cafeteria, enter in a contract with the first-tier customer, build out the cafeteria, buy the products to be sold in the cafeteria, run the cafeteria for eight weeks before it ever assigned the right for the alleged franchisee to come in and run it. And what Kim court said is that key association right there at the beginning, the relationship that was established between the franchisor and this first-tier customer that the court characterized as a captive umbrella customer handed over to the franchisee, that was the key association. The court said there was such a substantial association here between the operation of this franchisee's business and the franchisor's marks because, by gosh, this franchisor went in and set up the turnkey operation and, in fact, sold it under basically a marketing argument that, hey, we do this all over the place. This is just another one of our chances. But Gabbana seems to be suggesting that, say, for example, in the Emirates, that that is sort of what happened here, that Gap came in, coordinated the store-within-the-store concept with all the marks and so on. Why isn't that similar to Kim? Because, actually, Gap did not do that. What happened is, in this case, Gabbana alleges that it had contacts with people in the Middle East. That's its allegation in this case. It wanted to be a distributor. It entered a distributor agreement. It set up any relationship with the retailers. Gap had no contractual or otherwise relationship with these retailers. But didn't Gap send people to these stores? Admittedly, they were with Gabbana or whatever, but didn't they actually go over and help set these up? No. What the record shows is, once this contract was in place and once Gabbana had retailers in place who were selling these products, the record shows that these retailers from time to time requested materials that would prove the authenticity of the goods. They requested some advertising materials. They requested information about potential merchandising, and it's clear from the record that the merchandising was not required, and Gabbana has misrepresented that. They requested that of Gap, right? They requested it. They didn't request it of Gabbana. They requested it of Gap. Gap, in response to these requests, provided this information. Gap didn't set up. Was Gabbana going to San Francisco, invite them to San Francisco? At times, the retailers would come to San Francisco to examine future lines to determine what they wanted to order, which is, as a practical matter, if one is going to buy these products, they have to go see what is going to be sold. And Gabbana is a two-person operation. They don't have anything. They don't have stock. They don't have inventory. If a retailer wanted to order certain goods in the future, they would need to go somewhere to see what they would look like. And those kind of straightforward normal routines, we see this reference in the Commissioner's Guidelines, normal routines that you expect, such as efforts to protect trademarks or intellectual properties that are very basic and essential to certain kinds of distributor relationships, those do not impose franchise because it clearly, in distributor relationships, there has to be some kind of protections to ensure that the manufacturer's rights, the party that owns the marks, that their rights aren't diluted by the fact that they agreed to engage in a distributor relationship. And that's acknowledged in the Guidelines. It's acknowledged in the opinions of the Commissioner. And it's acknowledged in courts, not just from this jurisdiction, but elsewhere. Suppose it was completely clear, changing the facts. Yes. Completely clear that the distributor, Gabbana, had paid a substantial fee. We'll even call it $6 million for the opportunity to be the middleman here. And everything else proceeded in the same fashion. Now, the summary judgment was granted here not based on the franchise fee, but on the substantial association prong. I confess, I've got grave doubts about the merits of Gabbana's case. But I'm kind of hung up on why this prong is their problem. Because I don't understand how Gabbana's business could help but be substantially associated with the GAP identity, given that the retailers they're selling to are required to adopt the GAP store within store, the GAP look, the GAP experience. That's what they're seeking. It's not just anybody's merchandise they're putting on those shelves. It's GAP merchandise with a GAP feel. So how is it they don't think of Gabbana as being linked with GAP? Well, I think it's important. There are a few things going on in your question, Your Honor. First of all, I think it's important to draw a distinction, because the law does, between association with just GAP products and association with GAP marks. What the statute says is to satisfy the substantial association element, basically you have the franchisee operating under the prescribed marketing plan, and then you have the substantial association with the mark. And you could imagine a situation completely not present here, where you have this franchisee who is working under a marketing plan itself, selling itself under a prescribed marketing plan from the franchisor, and because of that, unsurprisingly, that franchisee's customers associate the franchisee with the mark. Here, you have the classic distributor. Of course, the distributor's customers know that the distributor is selling the products of GAP, that they're trying to buy GAP products. They, of course, therefore associate with the product. But the law is clear. We have cases from within and without this jurisdiction that show the fact that you are dealing with a company that's selling a product. The Hoosier case talks about it. The Liberty case talks about it. It doesn't turn it in. I have a 16-year-old daughter, and I understand that the same shirt with a GAP label is not the same shirt. In effect, a GAP shirt, the trademark, the trade name GAP, makes that shirt something different than exactly the same fabric stitched the same way without that label. And that's what labels, the value that labels add. If GAP has that kind of value here, if they're trying to create the GAP look, then why is this not a GAP shirt as opposed to just a shirt? Because, as the Liberty court explains, we cite this in our briefing, it's not the association with the product. And the product has a name on it. It's got a brand. But that's not the issue. What happens in a franchise is the franchisee pays money to basically be presented to the public as part of a chain. And by doing that, they get all the goodwill and reputation of the actual entirety of the company. It's not the product. It's the whole company. And Gabbana never operated itself in a way that could lead others to believe that this company was a chain of GAP. They couldn't do anything to present that to their customers. That's the problem. You also have the failure of Gabbana to establish it in the marketing plan element as well. Roberts. Thank you very much, Ms. Anderson. Thank you so much. Mr. Glick, you get the last word. Your Honors, I appreciate the time and opportunity. Let me just touch briefly on some points that were made by Ms. Anderson and responses to your own questions. As to the allegation that the GAP only came into contact with these retailers at the back end, on page 19 of our brief, we cited one of literally hundreds of examples of GAP's direct insistence and involvement well before the retailers were even established. Let me tell you what I understand Ms. Anderson's answer to that to be and see what you have to say about it. She says, okay, people might go into these store and stores, wherever they are, the average Joe who goes in to buy a GAP shirt. Whatever they think of that, that speaks to whether that retailer might or might not be associated with the mark. It doesn't speak to whether Gabbana, the distributor, is associated with the mark. Well, there are two answers to that. First of all, there's California authority, which is the Jayrock case, where, as I said, Jayrock only supplied 30% of the actual food to the site. And in that circumstance, the stickers on the food was found to be enough to create the substantial association with the first and second tier customers involved in that case. The bar is very low in California for substantial association. Counsel cites cases from other jurisdictions with other franchise laws. That's not the law in California, as shown in both Jayrock and in Kim. Here, GAP was inquiring about Qatar, advised which brands of all three in the location, will the area be remodeled, the back walls, et cetera. In Kim, the name couldn't be used at all. No consumer knew even what they were buying from, if there was any association with Servo. And, nevertheless, that was found to be a franchise based on the forms and the association, which is much greater here. One last point on the bona fide, if I may. On the bona fide wholesale price, Roots was a redistributor. So for that reason alone, it doesn't qualify. And, again, the inventory in that situation couldn't be sold in these stores. Thank you very much. Thank you, Mr. Glick. Ms. Anderson, thank you as well. The case just argued is submitted.
judges: Silverman, Clifton, Smith M.